Gayle M. Blatt, SBN 122048
*gmb@cglaw.com*
Jeremy Robinson, SBN 188325
*jrobinson@cglaw.com*
P. Camille Guerra, SBN 326546
*camille@cglaw.com*
James M. Davis, SBN 301636
*jdavis@cglaw.com*
**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

*Attorneys for Plaintiff*
*and the proposed classes*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE LUIS MARQUEZ, on behalf of himself and a class of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DICKEY'S BARBECUE RESTAURANTS, INC., a Texas corporation; and DICKEY'S CAPITAL GROUP, INC., a Delaware Corporation,<br><br>Defendants. | Case No.:  **'20 CV 2251 BEN MSB**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jose Luis Marquez, individually, and on behalf of all others similarly situated, upon personal knowledge of the facts pertaining to him and on information and belief as to all other matters, by and through undersigned counsel, hereby brings this Class Action Complaint against Defendants Dickey's Barbecue Restaurants, Inc. and Dickey's Capital Group, Inc. (collectively, "Dickey's" or "Defendants"), and alleges as follows:

## NATURE OF THE CASE

1.      Plaintiff asserts this class action against Defendants Dickey's Barbecue Restaurants, Inc. and Dickey's Capital Group, Inc. for their failure to exercise reasonable care in securing and safeguarding their customers' personal identifying information ("PII"), including names, payment card numbers, payment card expiration dates, and payment card security codes.

2.      On October 15, 2020, a daily blog that covers computer security and cybercrime, *KrebsOnSecurity.com*, revealed that payment card data had been stolen from Defendants' customers at more than 100 of Defendants' restaurant locations around the country (the "Data Breach").[1]

3.      The article revealed that on October 12, 2020, a "dark web" payment card bazaar, "Joker's Stash," debuted a batch of more than three million stolen payment card records and advertised "valid rates" of between 90 to 100 percent. Companies that track the sale of stolen payment card data found one common theme among all the accounts for sale: They were used at one or more of Defendants' restaurants over the preceding 13 to 15 months, from May 2019 through September 2020.[2]

4.      Gemini Advisory, a cyber intelligence firm, reported that approximately 156 of Defendants' locations across 30 states likely had payment

---

[1] Krebs on Security, *Breach at Dickey's BBQ Smokes 3M Cards*, *available at* https://krebsonsecurity.com/2020/10/breach-at-dickeys-bbq-smokes-3m-cards/#:~:text=KrebsOnSecurity%20has%20learned%20the%20data,card%20breach%20at%20Dickey's%20BBQ

[2] *Id.*

CLASS ACTION COMPLAINT

systems compromised by payment card-stealing malware, with the highest exposure in California and Arizona. Gemini Advisory also concluded that the payment transactions at Defendants' restaurants were processed via an outdated magstripe method, which is prone to malware attacks.[3]

5.     Defendants are no stranger to data breaches. In 2015, Defendants experienced a ransomware attack that demanded $6,000 to return the company's marketing files. Following that attack, Defendants published an article detailing the incident and committing to a robust cybersecurity posture. The article, complete with security best practices and an endorsement of investing in proactive measures, featured quotes from then-CEO Laura Rea Dickey.[4]

6.     Despite its past experience with data security incidents and promises to implement state of the art data security practices, Defendants again failed to protect its customers' PII with adequate data security.

7.     Defendants could have prevented this Data Breach. In the past few years, there have been several data breaches at other restaurant chains and retail establishments resulting from malware installed on point-of-sale ("POS") systems. Indeed, the susceptibility of POS systems to malware is well-known throughout the restaurant industry. In the last five years, practically every major data breach involving retail stores or fast-food restaurant chains has been the result of malware placed on POS systems. Accordingly, data security experts have warned companies, "[y]our POS system is being targeted by hackers. This is a fact of 21st-century business."[5] Unfortunately, Defendants' decision to ignore warnings like this led to the damage alleged here.

---

[3] Gemma Advisory, *Joker's Stash Breaches Dickey's Barbecue Pit*, *available at* https://geminiadvisory.io/jokers-stash-breaches-dickeys/

[4] Dickey.com, *DCEO: Guardians of the Network*, *available at* https://www.dickeys.com/press/in-the-news/dceo-guardians-of-the-network

[5] Datacap Systems Inc., *Point of sale security: Retail data breaches at a glance*, *available at* https://www.datacapsystems.com/blog/point-of-sale-security-retail-data-breaches-at-a-glance#.

CLASS ACTION COMPLAINT

8.     In addition to Defendants' failure to prevent the Data Breach, Defendants also failed to *detect* the breach even though it lasted for more than a year.

9.     The Data Breach was the result of Defendants' inadequate approach to data security and protection of its customers' PII that it collected during the course of business.

10.    Defendants disregarded the rights of Plaintiff and the Class by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected, failing to disclose to its customers the material fact that it did not have adequate computer systems and security practices to safeguard PII, failing to take available steps to prevent the Data Breach, and failing to monitor and timely detect the Data Breach.

11.    As a result of the Data Breach, Plaintiff's and Class members' PII has been exposed to criminals for misuse. The damages to Plaintiff and the Class include the following which have or may be suffered as a direct result of the Data Breach:

a.  unauthorized charges on debit and credit card accounts;

b.  theft of personal and financial information;

c.  costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts;

d.  damages arising from the inability to use debit or credit card accounts because accounts were suspended or otherwise rendered unusable as a result of fraudulent charges stemming from the Data Breach,

e.  damages arising from the inability to withdraw or otherwise access funds because accounts were suspended, restricted, or otherwise rendered unusable as a result of the Data Breach, including, but not limited to, missed bill and loan payments, late-payment charges, and lowered credit scores and other adverse impacts on credit;

CLASS ACTION COMPLAINT

f.   costs associated with spending time to address and mitigate the actual and future consequences of the Data Breach such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, including, but not limited to, lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

g.   the imminent and impending injury resulting from the potential fraud and identity theft posed by PII being exposed for theft and sale on the dark web

h.   costs of products and services purchased at Defendants' various restaurants during the period of the Data Breach because Plaintiff and the Class would not have dined at Defendants' various restaurants had Defendants disclosed that it lacked adequate systems and procedures to reasonably safeguard PII; and

i.   the loss of Plaintiff's and Class members' privacy.

12.    The injuries Plaintiff and the Class suffered were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for PII.

13.    Plaintiff and the Class members retain a significant interest in ensuring that their PII, which remains in Defendants' possession, is protected from further breaches, and seek to remedy the harms suffered as a result of the Data Breach for themselves and on behalf of similarly situated consumers whose PII was stolen.

## **JURISDICTION**

14.    Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value

CLASS ACTION COMPLAINT

of $75,000, exclusive of interest and costs, and is between citizens of different states.  Subject matter jurisdiction in this civil action is also authorized pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members, at least one class member is a citizen of a state different from that of Defendants, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

15.     The Court has personal jurisdiction over Defendants because their contacts with the State of California are systematic, continuous, and sufficient to subject it to personal jurisdiction in this Court. More specifically, Defendants have purposefully availed itself of the privilege of conducting business in this state by selling and maintaining over sixty restaurant franchises here.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to Plaintiff's and the Class members' claims occurred within this District. Numerous class members reside in this District and were therefore harmed in this District.

## PARTIES

17.     Plaintiff Marquez is a citizen of the State of California and resides in Riverside, California.

18.     Defendant Dickey's Barbecue Restaurants, Inc. is a Texas corporation with its principal place of business located at 4514 Cole Avenue, Suite 1015, Dallas, Texas 75205. Defendant operates a chain of corporate and franchise restaurants known as Dickey's Barbecue Pit.

19.     Defendant Dickey's Capital Group, Inc. is a Delaware corporation with its principal place of business located at 18583 N. Dallas Parkway, Suite 120, Dallas, Texas 75287. Dickey's Capital Group is the holding company of Dickey's Barbecue Restaurants, Inc., and has an estimated value of $400 million.

## FACTUAL BACKGROUND

### A. Point-of-Sale Systems

20.     The hospitality industry – restaurants, hotels, retail stores, and

museums – utilize point-of-sale ("POS") terminals or devices to process customer payments for goods or services. Essentially, a POS terminal is a computerized version of a cash register. POS terminals consist of a computer with specific software programs that can record and track customer orders, process credit and debit card transactions, connect to other systems in a network, and manage inventory.

21.    When a credit or debit card is swiped at a POS terminal, the payment card data (or "PCD") contained within a payment card is read and briefly stored in the POS terminal's memory while passing through a number of systems and networks before ultimately reaching the retailer's payment processor.

22.    PCD is stored in a POS system's memory in plain text and includes "Track 1" and "Track 2" data from the payment card. Tracks 1 and 2 data includes the cardholder's first and last name, the card's account number and expiration date, and the card's three-digit security code, known as the "CVV." This information, which can be used to clone credit/debit cards and to make purchases online or over the telephone, is unencrypted on the payment card and thus is unencrypted in the POS terminal's memory during processing.

23.    POS systems are particularly vulnerable to malware – which is malicious software specifically designed to steal customer payment information. Attacks on POS systems began in 2005. Attackers use network-sniffing malware to intercept credit and debit card data during transmission to payment processors.

24.    A malware attack is easy to implement and poses less risk to the attacker in terms of detection and capture as it can be installed remotely.

25.    All-in-one POS systems are typically based on operating systems such as Windows Embedded, Windows XP and later versions, in addition to Unix operating systems, such as Linux. Thus, POS systems are highly susceptible to an array of attacks that can result in large data breach incidents.

26.    For example, POS systems are vulnerable to "RAM-scraping"

malware, which permit attackers to exfiltrate data found in memory while the data is processing inside the terminal. Software vulnerabilities are another problem where there is no longer support or patches for POS systems that have older running operating systems such as Windows XP or Windows XP Embedded.

**B. Plaintiff's Transactions**

27.    On or about May 11, 2020, Plaintiff Marquez visited Dickey's Barbecue Pit, one of Defendants' affected restaurants, located at 12620 Day Street in Moreno Valley, using his debit card.

28.    Plaintiff continues to monitor his account in an effort to detect and prevent misuse.

29.    Since learning of the Data Breach, Plaintiff Marquez has had to review his account statements for fraudulent charges.

30.    Plaintiff would not have used his debit card to make purchases at one of Defendants' restaurants during the period of the Data Breach had Defendants disclosed that they lacked adequate computer systems and data security practices to safeguard customers' PII from theft.

31.    Plaintiff suffered actual injury from having his PII stolen as a result of the Data Breach.

32.    Plaintiff suffered actual injury and damages in paying money to, and purchasing products from, Defendants' restaurants during the Data Breach, expenditures which he would not have made had Defendants disclosed that they lacked computer systems and data security practices adequate to safeguard customers' PII from theft.

33.    Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach, and is concerned about the loss of his privacy.

34.    Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from

CLASS ACTION COMPLAINT

1    his PII being placed in the hands of criminals.

2        35.    Plaintiff has a continuing interest in ensuring his PII, which remains

3    in the possession of Defendants, is protected and safeguarded from future

4    breaches.

5    **C. Dickey's Customer Data Collection Practices**

6        36.    Defendant Dickey's Barbecue Restaurants, Inc. is a for-profit

7    corporation with more than 483 restaurant locations in 43 states.

8        37.    As part of the dining process, Defendants' restaurants, like most

9    restaurants, accept payment cards through POS terminals, which accept customer

10   payment card data and process it for payment at the time for which a meal is paid.

11   This data includes the cardholder name, the account number, expiration date, card

12   verification value ("CVV"), and PIN data for debit cards. Defendants store this PII

13   in the POS system and transmit this information to a third party for processing and

14   completion of the payment.

15       38.    At all relevant times, Defendants were well-aware, or reasonably

16   should have been aware, that the PII collected, maintained, and stored in the POS

17   systems is highly sensitive, susceptible to attack, and could be used for wrongful

18   purposes by third parties, such as identity theft and fraud.

19       39.    Such malware can go undetected for a long period of time, especially

20   if industry best practices are not routinely used.

21       40.    Card payment data in particular is a valuable commodity, and there

22   is a "cyber black market" in which criminals openly post stolen payment card

23   numbers for sale.

24       41.    Legitimate organizations and the criminal underground alike

25   recognize the value of PII contained in a merchant's data systems; otherwise, the

26   latter would not aggressively seek or pay for it.

27       42.    Professionals tasked with trying to stop fraud and other misuse

28   know that PII has real monetary value in part because criminals continue their

CLASS ACTION COMPLAINT

efforts to obtain this data.[6] In other words, if any additional breach of sensitive data did not have incremental value to criminals, one would expect to see a reduction in criminal efforts to obtain such additional data over time. However, just the opposite has occurred. For example, the Identity Theft Resource Center reported 1,579 data breaches in 2017, which represents a 44.7 percent increase over the record high figures reported for 2016.

43.     The PII of consumers remains of high value to identity criminals, as evidenced by the price criminals will pay through black-market sources, or what is often called the dark web. Experian reports that a stolen credit or debit card number can sell for $5–110 on the dark web.[7]

44.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding PII, and of the foreseeable consequences that would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on its customers as a result of a breach.

45.     Defendants were, or should have been, fully aware of the significant volume of daily credit and debit card transactions at their restaurants, amounting to tens of thousands of daily payment card transactions, and thus, the significant number of individuals who would be harmed by a breach of Defendants' systems.

46.     Unfortunately, and as alleged below, despite all of this publicly available knowledge of the continued compromises of PII in the hands of other third parties, such as retailers and restaurant chains, Defendants' approach to maintaining the privacy and security of Plaintiff's and Class members' PII was,

---

[6] CIO Magazine, *Data Breaches Rise as Cybercriminals Continue to Outwit IT*, *available at* http://www.cio.com/article/2686167/data-breach/data-breaches-rise-as-cybercriminals-continue-to-outwit-it.html, October 2016.

[7] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, *available at* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

CLASS ACTION COMPLAINT

reckless, or at the very least, negligent.

**D. The Data Breach**

47.    On October 15, 2020, highly respected security blogger Brian Krebs reported that one of the dark web's most popular stores for selling stolen credit card information, "Joker's Stash," had begun selling a batch of more than 3 million new card records that had been used by customers at Defendants' restaurants around the country.[8]

48.    "Joker's Stash" originally claimed that data from the breach would be available in August and again in September. On October 12, it debuted "BlazingSun," a compilation of three million stolen card records. "Joker's Stash" advertised the card payment information as having "valid rates" of between 90 to 100 percent.[9]



49.    As explained by Krebs, the valid rates indicated that the breached merchant – Dickey's – was either unaware of the data compromise or had only just begun responding to it.[10]

50.    Companies that track the sale in stolen payment card data, such as Q6 Cyber and Gemini Advisory, confirmed that the card-issuing financial institutions

---

[8] Krebs, *supra* note 1.

[9] *Id.*

[10] *Id.*

1   accounting with the accounts for sale in the BlazingSun batch had one common

2   theme: All accounts were used at various Dickey's restaurants over the preceding

3   13 to 15 months.[11]

4        51.    In its investigation of the Data Breach, Gemini Advisory concluded

5   that the widespread nature of the breach indicated that the theft may be linked to a

6   breach of Defendants' single central processor, which was used by a quarter of all

7   of Defendants' restaurant locations.[12]

8        52.    Gemini Advisory further reported that it had determined that the

9   payment transactions at Defendants' restaurants were processed via the outdated

10   magstripe method, which is prone to malware attacks.[13]

11        53.    Gemini Advisory reported that the financial institutions they have

12   been working with in connection with the Data Breach had already seen a

13   significant amount of fraud related to those accounts.[14]

14        54.    Following the previously alleged 2015 ransomware incident,

15   Defendants published an article detailing the incident and committing to robust

16   cybersecurity. That article set forth data security best practices and an

17   endorsement of investing in proactive data security measures, featuring quotes

18   from its CEO at the time.[15]

19        55.    Despite Defendants' purported commitment to data security, the

20   BlazingSun breach may contain as many as 3 million compromised card accounts

21   with a median price of $17 per card.[16] This Data Breach dwarfs the 2015

22   ransomware incident.

23        56.    In addition to Defendants' failure to prevent the Data Breach,

24
25   [11] Gemini Advisory, *supra* note 3.

25   [12] *Id.*

26   [13] *Id.*

27   [14] *Id.*

28   [15] Dickey's.com, *supra* note 4.

[16] Gemini Advisory, *supra* note 3.

CLASS ACTION COMPLAINT

Defendants also failed to detect the breach for nearly 17 months. Intruders, therefore, had months to collect PII unabated. During this time, Defendants failed to recognize that their systems had been breached and that intruders were stealing data on millions of payment cards. Timely action by Defendants likely would have significantly reduced the consequences of the breach. Instead, Defendants took more than 17 months to realize that their systems had been breached, and thus contributed to the scale of the Data Breach and the resulting damages to Plaintiff and Class members.

57.   While many merchants and vendors have responded to recent data breaches by adopting technology and security practices that help make transactions and stored data more secure, Defendants failed to do so. Instead, Defendants' restaurants continued to use the outdated magstripe method to process customers' purchases. This outdated magstripe method is prone to malware attacks.[17]

58.   Additionally, based on information and belief, Defendants did not provide written notice to consumers affected by the POS malware attack.

**E. Defendants Failed to Comply with Industry Standards**

59.   Despite the enumerated vulnerabilities of POS systems, available security measures, and reasonable business practices would have significantly reduced or even eliminated the likelihood that hackers could successfully infiltrate a business' POS system. The payment card networks (MasterCard, Visa, Discover, and American Express), data security organizations, state governments, and federal agencies have all implemented various standards and guidance on security measures designed to prevent these types of intrusions into POS systems. However, despite Defendants' understanding of the risk of data theft via malware installed on POS systems, and the widely available resources to prevent intrusion into POS data systems, Defendants failed to adhere to these guidelines and failed

---

[17] *Id.*

to take reasonable and sufficient protective measures to prevent the Data Breach.

60.     Security experts have recommended specific steps that retailers should take to protect their POS systems. For example, a few years ago, Symantec recommended "point to point encryption" implemented through secure card readers, which encrypt credit card information in the POS system, preventing malware that extracts card information through the POS memory while it processes the transaction.[18] Moreover, Symantec emphasized the importance of adopting EMV (Europay, Visa, and Mastercard) chip technology. Datacap Systems, a developer of POS systems, recommended similar preventative measures.[19]

61.     Credit card companies announced that retailers must use EMV chip reading machines by October 1, 2015 instead of swiping machines. EMV payment cards contain a microchip that is used to improve payment security and prevent counterfeit card fraud. Consumers insert their cards into the front of a card reader with the metallic square chip facing up instead of swiping cards. Cards with magnetic strips contain unchanging data that can easily be replicated over and over again, unlike the chip cards that create a unique transaction code that cannot be used again. If an attacker steals the chip data from a specific point of sale, card duplication is unavailable because the stolen transaction number created would not be usable again.

62.     Upon information and belief, Defendants failed to use EMV chips at many of its restaurants to process customers' transactions, and instead used an outdated magstripe method. The outdated magstripe method used by Defendants is prone to malware attacks.[20]

---

[18] Symantec, *A Special Report On Attacks On Point-of-Sale Systems*, p. 3 (Nov. 20, 2014), *available at* https://docs.broadcom.com/doc/attacks-on-point-of-sale-systems-en

[19] DataCap Systems, *supra* note 5.

[20] Gemini Advisory, *supra* note 3

63.     The major payment card industry brands set forth specific security measures in their Card (or sometimes, Merchant) Operating Regulations. Card Operating Regulations are binding on merchants and require merchants to: (1) protect cardholder data and prevent its unauthorized disclosure; (2) store data, even in encrypted form, no longer than necessary to process the transaction; and (3) comply with all industry standards.

64.     The Payment Card Industry Data Security Standard ("PCI DSS") is a set of requirements designed to ensure that companies maintain consumer credit and debit card information in a secure environment.[21]

65.     The PCI DSS "was developed to encourage and enhance cardholder data security" by providing "a baseline of technical and operational requirements designed to protect account data."[22] PCI DSS sets the minimum level of what must be done, not the maximum.

65.     PCI DSS 3.2 imposes the following requirements on Defendants:[23]

| PCI Data Security Standard – High Level Overview | | |
|---|---|---|
| Build and Maintain a Secure Network and Systems | 1. | Install and maintain a firewall configuration to protect cardholder data |
| | 2. | Do not use vendor-supplied defaults for system passwords and other security parameters |
| Protect Cardholder Data | 3. | Protect stored cardholder data |
| | 4. | Encrypt transmission of cardholder data across open, public networks |
| Maintain a Vulnerability Management Program | 5. | Protect all systems against malware and regularly update anti-virus software or programs |
| | 6. | Develop and maintain secure systems and applications |
| Implement Strong Access Control Measures | 7. | Restrict access to cardholder data by business need to know |
| | 8. | Identify and authenticate access to system components |
| | 9. | Restrict physical access to cardholder data |
| Regularly Monitor and Test Networks | 10. | Track and monitor all access to network resources and cardholder data |
| | 11. | Regularly test security systems and processes |
| Maintain an Information Security Policy | 12. | Maintain a policy that addresses information security for all personnel |

---

[21] Payment Card Industry Data Security Standard v3.2, at 5 (April 2016) *available at* https://www.pcihispano.com/contenido/uploads/2016/09/PCI_DSS_v3-2-1.pdf

[22] *Id.*

[23] *Id.*

66.     Among other things, PCI DSS required Defendants to properly secure and protect payment card data; not store cardholder data beyond the time necessary to authorize a transaction; maintain up-to-date antivirus software and a proper firewall; protect systems against malware; establish a process to identify and timely fix security vulnerabilities; and encrypt payment card data at the point of sale.

67.     PCI DSS also required Defendants not to store "the full contents of…the magnetic stripe located on the back of a card" or "the card verification code or value" after authorization.[24]  Despite understanding the consequences of inadequate data security, Defendants failed to comply with PCI DSS requirements and failed to take additional protective measures beyond those required by PCI DSS.

**F. Defendants Failed to Comply with Federal and State Requirements**

68.     Federal and State governments have likewise established security standards and issued recommendations to temper data breaches and the resulting harm to consumers and financial institutions.

69.     There are a number of state and federal laws and requirements and industry standards governing the protection of payment card data.

70.     For example, at least 24 states have enacted laws addressing data security practices that require that businesses that own, license or maintain personal information about a resident of that state to implement and maintain "reasonable security procedures and practices" and to protect personal information from unauthorized access. California is one such state and, per the California Consumer Privacy Act, requires that "A business that owns, license, or maintains personal information about a California resident shall implement and maintain reasonable security procedures appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use

---

[24] *Id.* at 38 (PCI DSS 3.2.1 and 3.2.2).

modification or disclosure." Cal. Civ. Code § 1798.81.5(b). Personal information under these statutes usually is defined to include an individual's first name or initial and last name in combination with a credit or debit card number that is in combination with any required security code, access code, or password that would permit access to the individual's financial account. See, e.g., Cal. Civ. Code § 1798.81.5(d)(1)(A)(iii).

71.    The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[25]

72.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[26] The guidelines note businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

73.    The FTC recommends that companies not maintain cardholder information longer than is needed for authorization of a transaction; limit access

[25] Federal Trade Commission, *Start With Security*, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf

[26] Federal Trade Commission, *Protecting Personal Information*: *A Guide for Business*, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

CLASS ACTION COMPLAINT

to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[27]

74.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

75.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

76.    In this case, Defendants were at all times fully aware of their obligation to protect the PII of customers because of their participation in payment card processing networks. Defendants were also aware of the significant repercussions if they failed to do so because Defendants collected payment card data from tens of thousands of customers daily and they knew that this data, if hacked, would result in injury to consumers, including Plaintiff and Class members.

77.    Despite understanding the consequences of inadequate data security, Defendants operated POS systems with the outdated magstripe method; failed to enable point-to-point and end-to-end encryption and failed to take other measures necessary to protect its data network.

**G. Plaintiff and Class Members Are Damaged**

78.    The PII of Plaintiff and Class members is private and sensitive in

---

[27] Federal Trade Commission, *supra* note 26.

1   nature and was left inadequately protected by Defendants. Defendants did not

2   obtain Plaintiff's and Class members' consent to disclose PII to any other person

3   as required by applicable law and industry standards.

4       79.    Defendants also failed to notify Plaintiff and Class Members of the

5   Data Breach, in direct violation of data breach notification laws, such as California

6   Civil Code § 1798.82.

7       80.    The Data Breach was a direct and proximate result of Defendants'

8   failure to properly safeguard and protect Plaintiff's and Class members' PII from

9   unauthorized access, use, and disclosure, as required by various state and federal

10  regulations, industry practices, and the common law, including Defendants' failure

11  to establish and implement appropriate administrative, technical, and physical

12  safeguards to ensure the security and confidentiality of Plaintiff's and Class

13  members' PII to protect against reasonably foreseeable threats to the security or

14  integrity of such information.

15      81.    Had Defendants remedied the deficiencies in their POS systems,

16  followed PCI DSS guidelines, and adopted security measures recommended by

17  experts in the field, Defendants would have prevented intrusion into their POS

18  systems and, ultimately, the theft of their customers' PII.

19      82.    As a result of Defendants' wrongful actions, inaction, negligent

20  security practices, and the resulting Data Breach, Plaintiff and Class members

21  have been placed at an imminent, immediate, and continuing increased risk of

22  harm from identity theft and identity fraud, requiring them to take the time which

23  they otherwise would have dedicated to other life demands such as work and

24  family in an effort to mitigate the actual and potential impact of the Data Breach

25  on their lives including, inter alia, by placing "freezes" and "alerts" with credit

26  reporting agencies, contacting their financial institutions, closing or modifying

27  financial accounts, closely reviewing and monitoring their credit reports and

28  accounts for unauthorized activity, and filing police reports. This time has been

1    lost forever and cannot be recaptured.

2        83.    Defendants' wrongful actions and inaction directly and proximately

3    caused the theft and dissemination into the public domain of Plaintiff's and Class

4    members' PII, causing them to suffer, and continue to suffer, economic damages

5    and other actual harm for which they are entitled to compensation, including:

6        a.  unauthorized charges on debit and credit card accounts;

7        b.  theft of personal and financial information;

8        c.  costs associated with the detection and prevention of identity theft and

9            unauthorized use of financial accounts;

10       d.  damages arising from the inability to use debit or credit card accounts

11           because accounts were suspended or otherwise rendered unusable as a

12           result of fraudulent charges stemming from the Data Breach;

13       e.  damages arising from the inability to withdraw or otherwise access funds

14           because accounts were suspended, restricted, or otherwise rendered

15           unusable as a result of the Data Breach, including, but not limited to,

16           missed bill and loan payments, late-payment charges, and lowered credit

17           scores and other adverse impacts on credit;

18       f.  costs associated with spending time to address and mitigate the actual

19           and future consequences of the Data Breach such as finding fraudulent

20           charges, cancelling and reissuing payment cards, purchasing credit

21           monitoring and identity theft protection services, imposition of

22           withdrawal and purchase limits on compromised accounts, including, but

23           not limited to, lost productivity and opportunity(ies), time taken from the

24           enjoyment of one's life, and the inconvenience, nuisance and annoyance

25           of dealing with all issues resulting from the Data Breach;

26       g.  imminent and impending injury resulting from the potential fraud and

27           identity theft posed by PII being exposed for theft and sale on the dark

28           web;

CLASS ACTION COMPLAINT

h.  loss of use of, and access to, their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse credit notations; and

i.  the loss of Plaintiff's and Class members' privacy.

84.    While Plaintiff's and Class members' PII has been stolen, Defendants continue to hold PII of consumers, including Plaintiff and Class members. Because Defendants have demonstrated an inability to prevent a breach or stop it from continuing even after being detected, Plaintiff and Class members have a strong interest in ensuring that their PII is secure, remains secure, is properly and promptly destroyed, and is not subject to further theft.

## CLASS ACTION ALLEGATIONS

85.    Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed classes pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3):

### A. The Nationwide Class

86.    Plaintiff seeks to represent a class comprised of United States residents (the "Nationwide Class"), defined as follows:

> All persons residing in the United States who made a credit or debit card purchase at any affected Dickey's Barbecue Pit restaurant during the period of the Data Breach.

### B. The California Subclass

87.    Plaintiff seeks to represent a class comprised of California residents (the "California Subclass"), defined as follows:

> All persons residing in the State of California who made a credit or debit card purchase at any affected Dickey's Barbecue Pit restaurant during the period of the Data Breach.

CLASS ACTION COMPLAINT

88.    Collectively, the Nationwide Class and California Subclass will be referred to as "the Class" except where there is need to distinguish the class and subclass.

89.    Excluded from the proposed Class are Defendants, including any entity in which Defendants have a controlling interest, is a subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants.

90.    Plaintiff reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

91.    **Numerosity**: Although the exact number of Class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough – with the Data Breach impacting approximately 3 million customer accounts - such that joinder is impracticable. The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. The Class members may be identifiable from objective means, such as information and records in Defendants' possession, custody, or control.

92.    **Commonality and Predominance**. Common questions of law and fact exist as to the proposed Class members and predominate over questions affecting only individual Class members. These common questions include:

    a.  Whether Defendants engaged in the wrongful conduct alleged herein;

    b.  Whether Defendants' security measures to protect their POS systems were reasonable in light of the PCI DSS requirements, FTC data security recommendations, and best practices recommended by data security experts;

    c.  Whether Defendants' failure to implement adequate data security measures resulted in or was the proximate cause of the breach of its POS

1    data systems;

2    d.  Whether Defendants' conduct, including their failure to act, resulted in

3       or was the proximate cause of the breach of the POS systems, resulting

4       in the loss of PII of Plaintiff and Class members;

5    e.  Whether Defendants owed a legal duty to Plaintiff and the other Class

6       members to exercise due care in collecting, storing, and safeguarding

7       their PII;

8    f.  Whether Defendants negligently or recklessly breached legal duties

9       owed to Plaintiffs and the other Class members to exercise due care in

10      collecting, storing, and safeguarding their PII;

11   g.  Whether Plaintiff and the Class are at an increased risk for identity theft

12      because of the Data Breach;

13   h.  Whether Defendants' conduct violated Cal. Bus. & Prof. Code § 17200,

14      et seq.;

15   i.  Whether Defendants violated section 1798.150 of the California

16      Consumer Privacy Act by failing to prevent Plaintiff's and Class

17      members' nonencrypted and nonredacted PII from unauthorized access

18      and exfiltration, theft, or disclosure, as a result of Defendants' violations

19      of their duty to implement and maintain reasonable security procedures

20      and practices appropriate to the nature of the information;

21   j.  Whether Plaintiff and the other Class members are entitled to actual,

22      statutory, or other forms of damages, and other monetary relief; and

23   k.  Whether Plaintiff and the other Class members are entitled to equitable

24      relief, including, but not limited to, injunctive relief and restitution.

25   93.    Defendants engaged in a common course of conduct giving rise to the

26   legal rights sought to be enforced by Plaintiff individually and on behalf of the

27   other Class members. Individual questions, if any, pale by comparison, in both

28   quantity and quality, to the numerous questions that dominate this action.

94.   **Typicality**: Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff is a consumer who used his payment card at an affected Dickey's restaurant locations and had his payment card data compromised as a result of the Data Breach. Plaintiff's damages and injuries are akin to other Class members, and Plaintiff seeks relief consistent with the relief of the Class members.

95.   **Adequacy of Representation**: Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members he seeks to represent; he has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

96.   **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT I
### Negligence
**(On Behalf of Plaintiff and the Nationwide Class)**

97.     Plaintiff incorporates by reference all allegations in this Complaint as though fully set forth herein.

98.     Defendants solicited and took possession of Plaintiff's and the Class members' PII, and Defendants had a duty to exercise reasonable care in securing that information from unauthorized access or disclosure. Defendants also had a duty to timely notify Plaintiff and the Class that their PII had been or may have been stolen. Defendants further had a duty to destroy Plaintiff's and Class members' PII within an appropriate amount of time after it was no longer required by Defendants, in order to mitigate the risk of such non-essential PII being compromised in a data breach.

99.     Upon accepting and storing Plaintiff's and Class members' PII in their computer systems and on their networks, Defendants undertook and owed a duty of care to Plaintiff and Class members to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII and to use commercially-reasonable methods to do so. Defendants knew that the PII was private and confidential and should be protected as private and confidential.

100.   Defendants owed a duty of care to not subject Plaintiff and Class members, along with their PII, to an unreasonable risk of harm because they were foreseeable and probable victims of inadequate security practices.

101.   Defendants owed a duty of care to Plaintiff and Class members to quickly detect a data breach and to timely act on warnings about data breaches.

102.   Defendants' duties arose from their relationship to Plaintiff and Class members and from industry custom.

103.   Defendants, through their actions and/or failures to act, unlawfully breached duties to Plaintiff and Class members by failing to implement standard

CLASS ACTION COMPLAINT

1    industry protocols and to exercise reasonable care to secure and keep private the

2    PII entrusted to it.

3        104.    Defendants, through their actions and/or failures to act, allowed

4    unmonitored and unrestricted access to its customers' unsecured PII.

5        105.    Defendants, through their actions and/or failures to act, failed to

6    provide adequate supervision and oversight of the PII with which it was entrusted,

7    despite knowing the risk and foreseeable likelihood of a breach and misuse, which

8    permitted unknown third parties to gather Plaintiff's and Class members' PII,

9    misuse that PII, and intentionally disclose it to unauthorized third parties without

10    consent.

11        106.    Defendants knew, or should have known, the risks inherent in

12    collecting and storing PII, the vulnerabilities of POS systems, and the importance

13    of adequate security. Defendants were aware, or should have been aware, of

14    numerous, well-publicized data breaches within the restaurant industry.

15        107.    Defendants knew, or should have known, that their data systems and

16    networks did not adequately safeguard Plaintiff's and Class members' PII.

17        108.    Due to Defendants' knowledge that a breach of its systems could

18    damage millions of its customers, including Plaintiff and Class members,

19    Defendants had a duty to adequately protect their data systems and the PII

20    contained therein.

21        109.    Defendants' own conduct also created a foreseeable risk of harm to

22    Plaintiff and Class members and their PII. Defendants' misconduct included

23    failing to: (1) secure the POS systems, despite knowing their vulnerabilities; (2)

24    comply with industry standard security practices; (3) implement adequate system

25    and event monitoring; and (4) implement the systems, policies, and procedures

26    necessary to prevent this type of data breach.

27

28

CLASS ACTION COMPLAINT

110.  Defendants also had independent duties under state and federal laws that required Defendants to reasonably safeguard Plaintiff's and Class members' PII, and promptly notify them about the Data Breach.

111.  Defendants breached their duties to Plaintiff and Class members in numerous ways, including:

  a.  by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class members' PII;

  b.  by creating a foreseeable risk of harm through the misconduct previously described;

  c.  by failing to comply with industry standard data security standards during the period of the Data Breach; and

  d.  by failing to timely and accurately disclose that Plaintiff's and Class members' PII had been improperly acquired or accessed.

112.  Through Defendants' acts and omissions described in this Complaint, including Defendants' failure to provide adequate security and its failure to protect Plaintiff's and Class members' PII from being foreseeably captured, accessed, disseminated, stolen, and misused, Defendants unlawfully breached their duties to use reasonable care to adequately protect and secure Plaintiff's and Class members' PII while it was within Defendants' possession or control.

113.  Upon information and belief, Defendants improperly and inadequately safeguarded Plaintiff's and Class members' PII in deviation of standard industry rules, regulations, and practices at the time of the unauthorized access. Defendants' failure to take proper security measures to protect customers' PII as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiff's and Class members' PII.

114.  In engaging in the negligent acts and omissions as alleged herein, which permitted an unknown third party to access Defendants' customers' PII,

Defendants violated Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This prohibition includes failing to have adequate data security measures and failing to protect their customers' PII.

115.    Plaintiff and the Class members are among the class of persons Section 5 of the FTC Act was designed to protect, and the injuries suffered by Plaintiff and the Class members is the type of injury Section 5 of the FTC Act was intended to prevent. As a result, Defendants are negligent per se.

116.    Neither Plaintiff nor the other Class members contributed to the Data Breach and subsequent misuse of their PII as described in this Complaint.

117.    Defendants' failure to exercise reasonable care in safeguarding PII by adopting appropriate security measures was the direct and proximate cause of Plaintiff's and Class members' PII being accessed and stolen through the data breach.

118.    Defendants breached their duties to Plaintiff and Class members by failing to provide fair, reasonable, and adequate computer systems and data security practices to safeguard Plaintiff's and Class members' PII.

119.    As a result of Defendants' breach of their duties, Plaintiff and the Class members suffered or are at increased risk of suffering damages including, but not limited to: loss of right to privacy of PII, damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of their PII; damages arising from Plaintiff's and Class members' inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including but not limited to late fees charged and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions,

closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports, and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

## COUNT II
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Nationwide Class)

120.   Plaintiff incorporates by reference all allegations in this Complaint as though fully set forth herein

121.   Defendants solicited and invited Plaintiff and Class members to eat at their restaurants and make purchases using their credit or debit cards as a form of payment. Plaintiff and Class members accepted Defendants' offers and used their credit or debit cards to make purchases at Defendants' various restaurants during the period of the Data Breach.

122.   When Plaintiff and Class members purchased and paid for Defendants' services and food products at Defendants' restaurants using payment cards, they provided their PII contained on the face of, and embedded in the magnetic strip of, their debit and credit cards. In so doing, Plaintiff and Class members on the one hand, and Defendants on the other, entered into mutually agreed-upon implied contracts pursuant to which Plaintiff and Class members agreed that their payment cards were valid and would provide compensation for their purchases, while Defendants agreed that they would use Plaintiff's and Class members' PII in their possession for only the agreed-upon payment and no other purpose. Implicit in the agreement to use the PII in its possession for only the agreed-upon payment and no other purpose was the obligation that

1  Defendants would use reasonable measures to safeguard and protect the PII of
2  Plaintiff and Class members in its possession.

3      123.  By accepting payment cards as methods of payment for purchases,
4  Defendants assented to and confirmed their agreement to reasonably safeguard
5  and protect Plaintiff's and Class members' PII from unauthorized disclosure or
6  uses and to timely and accurately notify Plaintiff and Class members if their data
7  had been breached and/or compromised.

8      124.  Plaintiff and Class members would not have provided and entrusted
9  their PII, including all information contained in the magnetic strips of their credit
10  and debit cards, to Defendants to eat at their restaurants and make purchases in
11  the absence of the implied contract between them and Defendants.

12      125.  Plaintiff and Class members fully performed their obligations under
13  the implied contracts with Defendants.

14      126.  Defendants breached the implied contracts made with Plaintiff and
15  Class members by failing to safeguard and protect Plaintiff's and Class
16  members' PII, and by failing to provide timely and accurate notice to them that
17  their PII was compromised as a result of the Data Breach.

18      127.  Defendants breached the implied contracts made with Plaintiff and
19  Class members by failing to ensure that Plaintiff's and Class members' PII in its
20  possession was used only for the agreed-upon payment for purchases and no
21  other purpose.

22      128.  Plaintiff and Class members conferred a monetary benefit on
23  Defendants. Specifically, they purchased goods and services from Defendants
24  and provided Defendants with their payment information. In exchange, Plaintiff
25  and Class members should have received the goods and services that were the
26  subject of the transaction and should have been entitled to have Defendants
27  protect their PII with adequate data security. Defendants knew that Plaintiff and
28  Class members conferred a benefit on Defendants, and accepted or retained that

benefit. Defendants profited from the purchases and obtained Plaintiff's and Class members' PII for business purposes.

129.   Defendants failed to secure Plaintiff's and Class members' PII and, therefore, did not provide full compensation for the benefit Plaintiff and Class members provided.

130.   Defendants acquired the PII through inequitable means when they failed to disclose the inadequate security practices previously alleged.

131.   If Plaintiff and Class members had known that Defendants would employ inadequate security measures to safeguard PII, they would not have made purchases at Defendants' various restaurants.

132.   As a direct and proximate result of Defendants' breaches of the implied contracts between Defendants on the one hand, and Plaintiff and Class members on the other, Plaintiff and Class members sustained actual losses and damages as described in detail above.

133.   Plaintiff and Class members were harmed as the result of Defendants' breach of the implied contracts because their PII was compromised, placing them at a greater risk of identity theft and subjecting them to identity theft, and their PII was disclosed to third parties without their consent. Plaintiff and the Class have also suffered, or will suffer, consequential out-of-pocket losses for procuring credit freeze or protection services, identity theft monitoring, late fees, bank fees, and other expenses relating to identity theft losses or protective measures. The Class members are further damaged as their PII remains in the hands of those who obtained it without their consent.

134.   This breach of implied contracts was a direct and legal cause of the injuries and damages to Plaintiff and Class members as described above.

## COUNT III
### Unjust Enrichment
### (On Behalf of Plaintiff and the Nationwide Class)

135.   Plaintiff incorporates by reference all allegations in this Complaint as

1  though fully set forth herein.

2      136.   Plaintiff and members of the Class conferred a monetary benefit on

3  Defendants. Specifically, they purchased goods and services from Defendants and

4  provided and entrusted their PII to Defendants.

5      137.   In exchange, Plaintiff and Class members should have received from

6  Defendants the goods and services, such as the security of payment information,

7  that were the subject of the transaction and should have been entitled to have

8  Defendants protect their PII with adequate data security.

9      138.   Defendants appreciated, accepted and retained the benefit bestowed

10  upon them under inequitable and unjust circumstances arising from Defendants'

11  conduct toward Plaintiff and Class members as described herein; Plaintiff and

12  Class members conferred a benefit on Defendants and, accepted or retained that

13  benefit. Defendants profited from the purchases and used Plaintiff's and Class

14  members' PII for business purposes.

15      139.   Defendants failed to secure Plaintiff's and Class members' PII and,

16  therefore, did not provide full compensation for the benefit Plaintiff and Class

17  members provided.

18      140.   Defendants acquired the PII through inequitable means in that they

19  failed to disclose the inadequate security practices previously alleged.

20      141.   If Plaintiff and Class members knew that Defendants would not

21  secure their PII using adequate security, they would not have made purchases at

22  Defendants' restaurants using their payment cards.

23      142.   Plaintiff and Class members have no adequate remedy at law.

24      143.   Under the circumstances, it would be unjust for Defendants to be

25  permitted to retain any of the benefits that Plaintiff and Class members conferred

26  on it.

27      144.   Under the principles of equity and good conscience, Defendants

28  should not be permitted to retain the money belonging to Plaintiff and Class

CLASS ACTION COMPLAINT

members because Defendants failed to implement the data management and security measures that industry standards mandate.

**COUNT IV**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class)**

145.   Plaintiff incorporates by reference all allegations in this Complaint as though fully set forth herein.

146.   Defendants' business practices as complained of herein violate the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. ("UCL").

147.   Defendants' practices constitute "unlawful" business practices in violation of the UCL because, among other things, they violate statutory law and the common law, including without limitation the California Consumer Privacy Act, Cal. Civ. Code § 1798.150, California's Consumer Records Act, Cal. Civ. Code § 1798.150, and Section 5 of the FTC Act.

148.   Defendants' actions and practices constitute "unfair" business practices in violation of the UCL, because, among other things, the gravity of the harm to Plaintiff and the Class members outweighs the utility of Defendants' conduct. This conduct includes Defendants' failure to adequately ensure the privacy, confidentiality, and security of customers' data entrusted to it and Defendants' failure to have adequate data security measures in place.

149.   As a result of Defendants' wrongful business practices, Plaintiff and members of the Class have suffered injury in fact and lost money or property as alleged herein.

150.   Defendants' wrongful business practices present an ongoing and continuing threat to the general public.

151.   Accordingly, Plaintiff and Class members have and will incur economic damages related to the breach including, time and money spent remedying the breach, monitoring their financial accounts to ensure no further

fraud or no fraud is perpetuated; time spent insuring that any unauthorized charges are identified and remedied; experiencing lack of access to funds while banks and financial institutions issue new cards; and the costs of credit monitoring, purchasing credit reports, and purchasing "freezes" to prevent opening of unauthorized accounts.

**COUNT V**
**Violation of the California Consumer Privacy Act**
**Cal. Civ. Code § 1798.150**
**(On Behalf of Plaintiff and the California Subclass)**

152.   Plaintiff incorporates by reference all allegations in this Complaint as though fully set forth herein.

153.   Defendants collect consumers' personal information as defined in Cal. Civ. Code § 1798.140. As a result, Defendant have a duty to implement and maintain reasonable security procedures and practices to protect this personal information. As alleged herein, Defendants failed to do so.

154.   Defendants violated § 1798.150 of the California Consumer Privacy Act ("CCPA") by failing to prevent Plaintiff and Class members' nonencrypted and nonredacted PII from unauthorized access and exfiltration, theft, or disclosure. These failures were the result of Defendants' violations of their duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

155.   As a direct and proximate result of Defendants' conduct, Plaintiff and the Class members' PII, including names, payment card numbers, payment card expiration dates, and payment card security codes, was subjected to unauthorized access, exfiltration, and theft. On information and belief, Plaintiff and the Class allege this PII was not encrypted or redacted in the format accessed during the Data Breach.

156.   Plaintiff and the Class members seek injunctive or other equitable relief to ensure Defendants hereafter adequately safeguards customers' PII by

CLASS ACTION COMPLAINT

implementing reasonable security procedures and practices. Such relief is particularly important because Defendants continue to hold customers' PII, including that of Plaintiff and the California Subclass. These individuals have an interest in ensuring that their PII is reasonably protected.

157.   On November 12, 2020, Plaintiff's Counsel sent a notice letter to Defendant Dickey's Barbecue Restaurants, Inc.'s registered service agent via FedEx Priority. On November 18, 2020, Plaintiff's Counsel sent a notice letter to Defendant Dickey's Capital Group, Inc.'s registered service agent via FedEx Priority  Assuming Defendants cannot cure the Data Breach within 30 days, and Plaintiff believes any such cure is not possible under these facts and circumstances, Plaintiff intends to promptly amend this complaint to seek actual damages and statutory damages of no less than $100 and up to $750 per customer record subject to the Data Breach on behalf of the California Subclass as authorized by the CCPA.

**<u>COUNT VI</u>**
**Violation of California's Customer Records Act – Inadequate Security**
**Cal. Civ. Code § 1798.150**
**(On Behalf of Plaintiff and the California Subclass)**

158.   Plaintiff incorporates by reference all allegations in this Complaint as though fully set forth herein.

159.   California Civil Code section 1798.80, *et seq.*, known as the "Customer Records Act" ("CRA") was enacted to "encourage business that own, license, or maintain personal information about Californians to provide reasonable security for that information." Cal. Civ. Code § 1798.81.5(a)(1).

160.   Section 1798.81.5, subdivision (b) of the CRA requires any business that "owns, licenses, or maintains personal information about a California resident" to "implement and maintain reasonable security procedures and practices appropriate to the nature of the information," and "to protect the personal information from unauthorized access, destruction, use, modification, or

disclosure." Section 1798.81.5, subdivision (d)(1)(B) defines "personal information" as including "A username or email address in combination with a password or security question and answer that would permit access to an online account." "Personal information" also includes an individual's first name or first initial in combination with a social security number, driver's license number, account number or credit or debit card number and access code, medical information, or health insurance information. Cal. Civ. Code § 1798.82(h).

161. Defendants are businesses that own, license, or maintain personal information about California residents. As alleged in detail above, Defendants failed to "implement and maintain reasonable security procedures and practices appropriate to the nature of the information," and "to protect the personal information from unauthorized access, destruction, use, modification, or disclosure," which resulted in the Data Breach.

162. As the direct result of Defendants' violation of section 1798.81.5, Plaintiff Marquez and California Subclass members were harmed because their PII was compromised, placing them at a greater risk of identity theft and their PII and disclosed to third parties without their consent. Plaintiff Marquez and the California Subclass members have also suffered and/or may suffer in the future consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures. The California Subclass members are further damaged as their PII remains in Defendants' possession, without adequate protection, and is also in the hands of those who obtained it without their consent.

163. Plaintiff Marquez and the California Subclass members seek all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to, damages suffered by Plaintiff and the other Class members as alleged above and equitable relief.

1

## **PRAYER FOR RELIEF**

2 WHEREFORE, Plaintiff, individually and on behalf of all others similarly

3 situated, respectfully requests that the Court enter an order:

4  a. Certifying the proposed Class as requested herein;

5  b. Appointing Plaintiff as Class Representative and undersigned counsel as

6   Class Counsel;

7  c. Finding that Defendants engaged in the unlawful conduct as alleged herein;

8  d. Enjoining Defendants' conduct and requiring Defendants to implement

9   proper data security policies and practices;

10  e. Awarding Plaintiff and Class members damages;

11  f. Awarding Plaintiff and Class members pre-judgment and post-judgment

12   interest on all amounts awarded;

13  g. Awarding Plaintiff and the Class members reasonable attorneys' fees, costs,

14   and expenses; and

15  h. Granting such other relief as the Court deems just and proper.

16

17

## **DEMAND FOR JURY TRIAL**

18 Plaintiff, on behalf of himself and the proposed Class, hereby demands a

19 trial by jury as to all matters so triable.

20

21 Dated: November 18, 2020   /s/ Gayle M. Blatt

22            GAYLE M. BLATT

23            **CASEY GERRY SCHENK**

24            **FRANCAVILLA BLATT &**

            **PENFIELD, LLP**

25

26            *Attorneys for Plaintiff and the*

            *putative Class*

27

28

CLASS ACTION COMPLAINT